IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FREDDY L. FLONNORY, | : | |
| | : | |
| Petitioner, | : | |
| | : | |
| v. | : | Civ. Act. No. 08-566-JJF |
| | : | |
| PERRY PHELPS, Warden, and | : | |
| ATTORNEY GENERAL OF THE STATE | : | |
| OF DELAWARE, | : | |
| | : | |
| Respondents. | : | |

_____

Freddy L. Flonnory. Pro se Petitioner.

James T. Wakley, Deputy Attorney General, Delaware Department of
Justice, Wilmington, Delaware.  Attorneys for Respondent.

_____

**MEMORANDUM OPINION**

July 30, 2010
Wilmington, Delaware

Farnan, District Judge.

Pending before the Court is an Application For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 ("Petition") filed by Petitioner Freddy L. Flonnory. (D.I. 1.) For the reasons discussed, the Court will deny the Petition.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

A longstanding feud between Krey Twyman and Richard Grantham began on Christmas day in 1996, when both individuals were incarcerated at the Ferris School. Grantham, who had behavioral problems, was normally isolated from the general inmate population. Twyman and other inmates at Twyman's table apparently gave Grantham mean looks and made threatening gestures toward him. Grantham responded by throwing a food tray at Twyman, spilling juice on him. While the guards restrained Grantham, Twyman calmly and coolly informed Grantham that "it was not over" and that "he would get him [Grantham] in the world." The feud continued after Grantham and Twyman were released from the detention facility. Flonnory v. State, 893 A.2d 507, 513 (Del. 2006).

On July 1, 1997, Petitioner, who was then 17 years old, Twyman, who was then 15, and several others were "hanging out" on the street in Bethel Village when Grantham drove by in a car with Dwayne Warren and Danya "Duke" Adams. While the car was stopped at a red light, Grantham saw Twyman, Twyman's brother Terrell,

1

and Petitioner nearby. Twyman picked up a bottle and threw it at Grantham's car. Grantham drove off through the red light to the west side of Wilmington, where Adams retrieved his handgun. Id.

After getting the handgun, Grantham, Adams, and Warren drove to the area of 24th and Market Streets. Twyman, who by this time had returned to the area, spotted Grantham in the car. Twyman and several others, including Petitioner, approached the car. Adams responded by firing several shots into the group that gathered around the car. One of the shots struck Twyman in the arm. Another shot passed through Petitioner's clothes, barely missing him, but leaving him unharmed. A third shot hit a car belonging to Petitioner's mother that was parked near the intersection. Several of Petitioner's nieces and nephews, as well as his girlfriend, were sitting in the car at the time of the shooting. When the Wilmington Police arrived at the scene, neither Petitioner, Twyman, nor Petitioner's relatives informed the police that Adams was the shooter. Id.

For the next several weeks, Twyman expressed a desire to retaliate against Adams and the "Westside boys" for the shooting. On July 13, 1997, Petitioner and Twyman decided to seek revenge for the July 1 shooting. Shortly before midnight, Twyman and Petitioner got a ride to the west side of Wilmington with Lionel "Moose" Robinson. Robinson was a "gypsy", an unlicensed taxi driver, who gave rides in his red Chevrolet cavalier in exchange

2

for money or drugs. After circling the area around 6ᵗʰ and
Madison Streets, Twyman spotted Adams and instructed Robinson to
park at 6ᵗʰ and Washington Streets. Twyman and Petitioner left
the car and asked Robinson to wait for them to return. The two
then proceeded through an alleyway and entered the 600 block of
Jefferson Street. Id.

Danya "Duke" Adams, Dwayne Warren, Deshawn "Dewey" Scott,
and Angela Farmer were seated on chairs and on an old television
set in the road near the intersection of 6ᵗʰ and Jefferson
Streets. The four heard shots fired. They realized that they
were the target of those shots when they observed sparks from the
bullets hitting the ground near them. Farmer, who was 17 years
old at the time, was hit three times and fell dead from a fatal
shot to the chest. Dewey managed to flee the scene. Adams, who
was 18 years old, was struck by two bullets. Warren, after being
struck by two bullets in the leg, tried to carry Adams behind a
car after Adams had been shot. Adams' injuries, however, turned
out to be fatal. Id.

In September 1997, Petitioner and his co-defendant Korey
Twyman were indicted on two counts of first degree intentional
murder, attempted first degree murder, first degree conspiracy,
and related weapons offenses. Petitioner moved to sever his
trial from that of Twyman, and the Delaware Superior Court
granted that motion in September 1998. A Delaware Superior Court

3

jury convicted Petitioner of all charges, and the Superior Court sentenced him to death for each of the two murder convictions. The Delaware Supreme Court reversed Petitioner's convictions and sentences on August 14, 2001. Flonnory v. State, 778 A.2d 1044 (Del. 2001).

Following a new jury trial in February 2004, Petitioner was convicted on all charges. At sentencing, the Superior Court judge found that the mitigating factors outweighed the aggravating factors and sentenced Petitioner to life in prison for both of the first degree murder convictions; a third term of life imprisonment for the attempted murder conviction; and a total of sixty years incarceration for the remaining convictions. The Delaware Supreme Court affirmed Petitioner's convictions and sentences on direct appeal. Flonnory, 893 A.2d 507.

In January 2007, Petitioner filed a pro se motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"), which the Superior Court denied in February 2008. State v. Flonnory, 2008 WL 495780 (Del. Super. Ct. Feb. 2008). The Delaware Supreme Court affirmed the Superior Court's judgment. Flonnory v. State, 959 A.2d 27 (Table), 2008 WL 3906077 (Del. Aug. 2008).

4

## II. GOVERNING LEGAL PRINCIPLES

### A. Exhaustion and Procedural Default

A petitioner must exhaust all remedies available in the state courts as a prerequisite to federal habeas review. See 28 U.S.C. § 2254(b)(1). The exhaustion requirement is grounded on principles of comity to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). A petitioner satisfies the exhaustion requirement by "fairly presenting" the substance of the federal habeas claims to the state's highest court, either on direct appeal or in a post-conviction proceeding, and in a procedural manner permitting the state courts to consider them on the merits. See Duncan v. Henry, 513 U.S. 364, 365 (1995); Castille v. Peoples, 489 U.S. 346, 351 (1989); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997). If a petitioner presents unexhausted habeas claims to a federal court, but state procedural rules bar further state court review of those claims, the federal court will excuse the failure to exhaust and treat the claims as exhausted but procedurally defaulted. Coleman v. Thompson, 501 U.S. 722, 749 (1991); Lines v. Larkins, 208 F.3d 153, 160 (3d Cir. 2000).

A federal court cannot review the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting

5

therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims.[1]  McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999); Coleman, 501 U.S. at 750-51;  Caswell v. Ryan, 953 F.2d 853, 861-62 (3d Cir. 1992). Alternatively, if the petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice.  Murray, 477 U.S. at 496; Edwards v. Carpenter, 529 U.S. 446, 451 (2000);  Wenger v. Frank, 266 F.3d 218, 224 (3d Cir. 2001).  The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. Bousley v. United States, 523 U.S. 614, 623 (1998);  Murray, 477 U.S. at 496.  A petitioner establishes actual innocence by asserting "new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - - that was not presented at trial," showing that no reasonable juror would have found the petitioner guilty

---

[1]     To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Id. at 494.

beyond a reasonable doubt.   <u>Hubbard v. Pinchak</u>, 378 F.3d 333, 339-40 (3d Cir. 2004).

## B. Standard of Review

When a state's highest court has adjudicated a federal habeas claim on the merits,[2] the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).   Pursuant to § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial.   28 U.S.C. § 2254(d)(1) & (2);   <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000);   <u>Appel v. Horn</u>, 250 F.3d 203, 210 (3d Cir. 2001).

In a habeas proceeding, a federal court must presume that the state court's determinations of factual issues are correct. 28 U.S.C. § 2254(e)(1).   This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary.   28 U.S.C. § 2254(e)(1);   <u>Campbell v. Vaughn</u>, 209 F.3d 280, 286 (3d

---

[2]     A state court decision constitutes an adjudication on the merits for the purposes of § 2254(d), if the decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground.   <u>Thomas v. Horn</u>, 570 F.3d 105, 115 (3d Cir. 2009).

Cir. 2000); Miller-El v. Cockrell, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III. DISCUSSION

Petitioner presents the following nine grounds[3] for habeas relief: (1) by permitting the prosecution to use the hearsay statements of Akhee Flonnory, the trial court violated Petitioner's rights under the Confrontation Clause as articulated in Crawford v. Washington, 541 U.S. 36 (2004); (2) the trial court violated Del. Code Ann. Tit. 11, § 3507 by permitting Agent Shanahan to testify as to Joy Watson's out-of-court statements, because his police report contained an interpretative narrative rather than a verbatim recounting of Watson's statements; (3) the trial court misapplied § 3507 by allowing the out-of-court hearsay statements of several state witnesses to be entered as trial exhibits; (4) the State's proffer of an inadvertently incorrect transcription of Lionel Robinson's videotaped statement constituted a violation of Brady v. Maryland, 373 U.S. 83 (1963); (5) the trial court violated Petitioner's rights under the Confrontation Clause by permitting the prosecution to use the

_____

[3]    The Petition asserts these claims in summary form, and Petitioner did not file a Memorandum in Support. Therefore, the Court will address the claims as they were raised in Petitioner's state court pleadings. See generally, DeShields v. Snyder, 829 F. Supp. 676, 678 n.1 (D. Del. 1993).

prior testimony of Dwayne Warren; (6) the trial court violated

Petitioner's rights under the Confrontation Clause by refusing to

inform the jury that Warren was unavailable because he had

asserted his Fifth Amendment right against self-incrimination;

(7) there was insufficient evidence to support his convictions;

(8) prosecutorial misconduct; and (9) trial counsel rendered

ineffective assistance.

The Court concurs with the State's assertion that the

Petition is timely filed. Accordingly, the Court will address

the nine claims of the Petition in turn.

## A.    Claims Two and Three: Violations of Del. Code. Ann. tit. 11, § 3507

Section 3507 of the Delaware Annotated Code provides, in

relevant part, that "[i]n a criminal proceeding, the voluntary

out-of-court prior statement of a witness who is present and

subject to cross-examination may be used as affirmative evidence

with substantive independent testimonial value." Del. Code Ann.

tit. 11, § 3507. In Claim Two, Petitioner contends that the

trial court violated § 3507 by permitting Agent Shanahan to

testify as to Joy Watson's out-of-court statements because

Shanahan's police report contained an interpretative narrative

rather than a verbatim recounting of Watson's statements.[4]  Claim

_____

    [4]    Watson was called as a witness during Petitioner's
retrial.  In response to most of the State's questions, Watson
responded that she could not remember.  The State then called
Stranahan as a § 3507 witness.  Stranahan read verbatim the notes

9

Three asserts that the trial court misapplied § 3507 by allowing

the video and audio tapes of the out-of-court hearsay statements

provided by several state witnesses to be entered as trial

exhibits that the jury could take into the jury room and replay.

According to Petitioner, § 3507 should be construed as only

permitting in-court testimony regarding such statements or the

playing of the recorded statements during the trial.   The

Delaware Supreme Court rejected both arguments, holding that the

trial court properly applied § 3507 in permitting Stranahan to

testify about the statements Watson provided during the

interview, and that any error in admitting the § 3507 statements

as trial exhibits was harmless beyond a reasonable doubt.

As presented in this proceeding, Claims Two and Three assert

state law error.   It is well-settled that state law errors are

not cognizable on federal habeas review.  28 U.S.C. § 2254(a);

Estelle v. McGuire, 502 U.S. 62, 67-8 (1991).  Accordingly, the

Court will deny Claims Two and Three for failing to assert a

proper basis for Federal habeas relief.[5]

_____

he took from his interview with Watson.  Flonnory, 893 A.2d at
523.

[5]     The Court acknowledges that the Delaware Supreme Court
recently issued three decisions regarding the foundational
requirements for admitting a witness' prior statements under §
3507.  See Woodlin v. State, - A.2d -, 2010 WL 2873881 (Del. July
22, 2010); Stevens v. State, - A.2d -, 2010 WL 2873802 (Del.
July 22, 2010); Blake v.State, - A.2d -, 2010 WL 2873823 (Del.
July 22, 2010).  These decisions, however, do not alter the
Court's determination that Claims Two and Three assert only state

10

**B.   Claims Adjudicated on the Merits in State Court**

The Delaware Supreme Court denied Claims One, Four, Five, Six, Seven, Eight, and portions of Claim Nine, on the merits. Consequently, the Court will review the claims under § 2254(d)(1) to determine if the Delaware Supreme Court's denial was contrary to, or an unreasonable application of, Supreme Court precedent.

### 1.   Claim One: The admission of Akhee Flonnory's hearsay statements violated Crawford

The State called Petitioner's brother Akhee to testify during Petitioner's second trial. Before ending its direct examination of Akhee, the State called Wilmington police Detective Liam Sullivan to the witness stand, through whom the State introduced a videotaped police interview of Akhee. The State also introduced several other out-of-court statements Akhee had made to the police.

In Claim One, Petitioner contends that the admission of Akhee's videotaped police statement violated his Sixth Amendment right of confrontation as defined in Crawford v. Washington. Petitioner argues that Crawford precludes the use of statements that are the product of police interrogation. See (D.I.27, Appellant's Op. Br. in Flonnory v. State, No. 358,2004, at p. 13.)

_____

law errors.

The Delaware Supreme Court denied the instant Claim as meritless, explaining that

> [Petitioner's] Crawford argument is misplaced. [] Akhee was present at the trial and subject to cross-examination, [and therefore,] the admission of those statements did not deprive [Petitioner] of either his right to confront or cross-examine his accusers.

Flonnory, 893 A.2d at 521. In reaching its decision, the Delaware Supreme Court identified and analyzed the instant argument pursuant to Crawford. Therefore, the Court concludes that the Delaware Supreme Court's decision was not "contrary to" clearly established Federal law. See Williams, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The Court also concludes that the Delaware Supreme Court's decision did not involve an unreasonable application of Crawford. Contrary to Petitioner's belief, Crawford does not preclude the use of all statements that are the product of police interrogation. Rather, Crawford prohibits the admission of out-of-court testimonial statements in a criminal case when the declarant is not available during the trial and the defendant did not have a prior opportunity to cross-examine that declarant. In this case, the traditional protections afforded under the Confrontation Clause were satisfied because Akhee testified, and

12

defense counsel extensively cross-examined Akhee regarding the statements he made to the police. See Crawford, 541 U.S. at 59 n.9 ("We reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements . . . so long as the declarant is present at trial to defend or explain it."). Accordingly, the Court will deny Claim One.

## 2. Claim Four: Brady violation

In a videotaped police statement, Lionel Robinson, the "gypsy" taxi driver who drove Petitioner and Twyman to the scene of the shooting, observed that both Petitioner and Twyman were in possession of semi-automatic weapons and that neither had a revolver. The State provided Petitioner with a copy of Lionel Robinson's videotaped police statement, as well as a transcript of Robinson's statement, during the pre-trial discovery period for Petitioner's first trial. However, the transcript omitted Robinson's observation that neither Petitioner nor Twyman were in possession of a revolver.

The State's theory during Petitioner's first trial was that Petitioner shot and killed Farmer with a revolver. Petitioner testified that he was not armed and that he did not fire a weapon. The defense also contended that there was return fire and that Petitioner never had a revolver. Neither the State nor the defense questioned Lionel Robinson about the weapons alleged

13

to be involved.

Before his retrial, Petitioner moved to "Preclude a Death Sentence and Use of Defendant's Prior Testimony" as evidence in the new trial. The premise for Petitioner's motion was that the State did not timely disclose the exculpatory evidence from Robinson's transcript that Robinson had observed Petitioner with a .9 millimeter semiautomatic weapon on the night of the murder. The Superior Court judge denied the motion, noting that "[i]t is undisputed that the Defense had access to . . . Robinson's videotaped statement prior to the introduction of the statement at [Petitioner's] trial [and that t]he jury, the defense, and the judge had access to the exculpatory evidence during [Petitioner's] trial." Flonnory, at 531. Petitioner challenged the denial of his motion on direct appeal, arguing that, although he had access to Robinson's complete observation before his second trial, "meaningful disclosure that Robinson told the police that he saw [Petitioner] with a semi-automatic, not a revolver, would have rendered Petitioner's testimony unnecessary" to support his return gunfire defense. In short, Petitioner asserted that he would not have testified during his first trial if he had been provided with the correct transcript of Robinson's statement. The Delaware Supreme Court rejected Petitioner's argument, ruling that no Brady violation had occurred because the State provided a copy of the videotaped statement to defense

14

counsel prior to the first trial.

Now, in Claim Four, Petitioner again asserts that the State violated Brady v. Maryland's requirement of disclosing all material exculpatory evidence to a defendant by providing an inaccurate transcription of Robinson's videotaped statement during his first trial. In order to establish a violation under Brady, Petitioner must show that the evidence at issue was suppressed, that it was favorable to him, either because it is exculpatory or because it is impeaching, and that there is a reasonable likelihood that the result of the trial would have been different if the information had been disclosed earlier. After reviewing the record, the Court concludes that Petitioner cannot establish a Brady violation because he cannot demonstrate that the evidence at issue was suppressed. Robinson's statement that Petitioner possessed a semiautomatic weapon on the night of the murder, rather than a revolver, was available to Petitioner and his defense counsel throughout the first trial because the State turned over a copy of Robinson's videotaped interview prior to that trial.⁶  Therefore, the Court concludes that the Delaware

---

⁶    As explained by the Delaware Supreme Court,

> [Petitioner] had an obligation to review the first transcript and the video taped recording of Robinson's statement to ensure that the transcript accurately reproduced the statement. The State will not be found to have suppressed material information if that information also was available to a defendant through the exercise of reasonable diligence. The State did not violate its Brady

Supreme Court's rejection of Claim Four was neither contrary to, nor an unreasonable application of, clearly established Federal law.  Accordingly, the Court will deny the Claim for failing to satisfy § 2254(d).

> **3.  Claim Five: The admission of Warren's testimony from Petitioner's first trial violated Petitioner's rights under the Confrontation Clause as defined in Crawford**

Dwayne Warren, one of the shooting victims, testified during Petitioner's first trial, and defense counsel cross-examined him. At the time of Petitioner's retrial, Warren was facing first degree murder charges from an unrelated case.[7]  Consequently, when the State called Warren to testify during Petitioner's retrial, Warren invoked his Fifth Amendment privilege against self-incrimination and did not provide any testimony.  Given Warren's invocation of his Fifth Amendment privilege, the Superior Court determined that Warren was unavailable to testify, and permitted the State to read Warren's former testimony into the record.

------------

obligations by producing an inaccurate transcription of Robinson's statement before the first trial, because it also produced an accurate videotaped copy of Robinson's statement.  Had the defense reviewed the video tape in conjunction with the transcript, it could have uncovered the transcription error."

Flonnory, at 532 (internal citations omitted).

[7]    Warren was not facing these charges when he testified during Petitioner's first trial.

16

On direct appeal, Petitioner contended that the Superior Court violated Crawford by admitting the testimony Warren provided during Petitioner's first trial at his retrial, because events subsequent to Warren's testimony rendered it unreliable. For instance, two days after testifying that he did not carry a weapon and that his days of violence were over, Warren was arrested and later convicted of first degree robbery and second degree assault for shooting a person. Additionally, during a psychological evaluation performed with respect to Warren's separate criminal case, Warren stated that every time he saw a "white van" he "went off." However, the evidence in Petitioner's case demonstrated that he was driven to and from the scene in a red car. According to Petitioner, the suggestion that a white van was present at the scene supports his "return gunfire" theory.

After explaining the similarities between Crawford and Delaware Rule of Evidence 804(b), the Delaware Supreme Court rejected Petitioner's argument. The Delaware Supreme Court opined that defense counsel's cross-examination at the first trial was sufficient to satisfy Petitioner's rights under the Confrontation Clause as defined by Crawford, because Petitioner "had a similar motive and opportunity to cross-examine Warren during [his] first trial." Flonnory, 893 A.2d at 533-534.

17

In Claim Five, Petitioner contends that the admission of Warren's testimony from his first trial at his retrial violated Crawford, because his earlier testimony was rendered unreliable by the events that occurred after Warren testified in Petitioner's first trial. After reviewing the record, the Court concludes that Delaware Supreme Court did not unreasonably apply clearly established Federal law in holding that the introduction of Warren's prior testimony did not violate Petitioner's rights under the Confrontation Clause as defined in Crawford. To begin, Warren was not available to testify at Petitioner's retrial due to his invocation of his Fifth Amendment privilege against self-incrimination, thereby satisfying the "unavailable declarant" requirement of Crawford. See, e.g., United States v. Sasso, 59 F.3d 341, 349 (2d Cir. 1995). Additionally, defense counsel's cross-examination of Warren during Petitioner's trial satisfied Crawford's "prior opportunity for cross-examination" requirement, as demonstrated by both defense counsel's vigorous cross-examination of Warren during Petitioner's first trial and the fact that Petitioner had a similar motive for developing Warren's testimony in both trials. This conclusion is further supported by the fact that evidence of Warren's subsequent convictions and his inconsistent statement regarding the color of the vehicle was admitted during Petitioner's re-trial. See, e.g., United States v. Garcia, 117 Fed. Appx. 162, 2004 WL 2830777, at **3 (2d Cir.

Dec. 10, 2004); United States v. Vigil, 2006 WL 4061155, at *4-*6 (D.N.M. Sept. 13, 2006). Accordingly, the Court will deny Claim Five for failing to satisfy the requirements of § 2254(d).

> **4. Claim Six: Petitioner's constitutional rights were violated when the trial court did not inform the jury that Warren's unavailability was due to his invocation of his Fifth Amendment privilege against self-incrimination**

When Warren invoked his Fifth Amendment privilege against self-incrimination during Petitioner's re-trial, he did so outside the presence of the jury. Defense counsel argued that the jury should be told that Warren was unavailable due to his assertion of his Fifth Amendment rights, and not because of death, misconduct, or any threat by Petitioner or anyone associated with him. The State responded that the trial court should not instruct the jury that Petitioner was unavailable by reason of invoking his Fifth Amendment privilege, because that would encourage the jury to speculate about why he did so. The trial judge agreed with the State, explaining that "simply say[ing] that the witness is unavailable . . . explains it, as far as the jury needs to know. I'm going to deny the motion to give instructions with respect to the Fifth Amendment." Flonnory, 893 A.2d at 534-35.

Before Warren's testimony from the first trial was read into the record at his retrial, the trial judge informed the jury that "you're going to hear testimony read from Mr. Warren who is

19

unavailable to testify at this trial." Id. at 535. Later, during the State's rebuttal closing argument, the trial judge also instructed the jury that Warren "was unavailable to testify at this trial because he is currently facing charges that don't arise from this particular incident." Id. On appeal, Petitioner argued that introducing Warren's former testimony without either requiring Warren to invoke his Fifth Amendment rights in front of the jury, or at a minimum, informing the jury of the reason for his unavailability, violated Petitioner's rights to cross-examination and confrontation. The Delaware Supreme Court rejected this argument. Flonnory, 893 A.2d at 535.

Now, in Claim Six, Petitioner asserts the same argument regarding Warren's invocation of his Fifth Amendment rights that he raised on direct appeal. The Court, however, cannot conclude that the Delaware Supreme Court's denial of Claim Six was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, because the United States Supreme Court has never squarely addressed the issue as to whether a criminal defendant's constitutional rights are violated when a witness invokes his or her Fifth Amendment rights against self-incrimination outside the presence of the jury. See Wright v. Van Patten, 552 U.S. 120, 126 (2008); Thomas v. Carroll, 581 F.3d 118, 124 (3d Cir. 2009). Moreover, the Court is persuaded that the instant Claim does not warrant habeas relief for two

additional reasons. First, the trial judge provided a "neutralizing instruction" to the jury during the course of the State's rebuttal closing argument, which sufficiently informed the jury about the reason for Warren's unavailability and prevented the jury from speculating about why Warren was absent from Petitioner's retrial. See, e.g., United States v. Martin, 526 F.2d 485, 487 (10th Cir. 1975). Second, several Federal courts of appeal addressing the instant issue, including the Third Circuit, have held that neither the government nor the defense may call a witness solely for the purpose of having that witness invoke the Fifth Amendment in front of the jury. See, e.g., United States v. Santiago, 566 F.3d 65, 70 (1st Cir. 2009); United States v. Monnier, 412 F.3d 859 (8th Cir. 2005); United States v. Castorena-Jaime, 285 F.3d 930, 931 (10th Cir. 2002); United States v. Pitts, 918 F.2d 200 (D.C. Cir. 1990); United States v. Lyons, 703 F.2d 815, 818 (5th Cir. 1983); Nezowy v. United States, 723 F.2d 1120, 1124 n.6 (3d Cir. 1983). Accordingly, the Court will deny Claim Six.

### 5. Claim Seven: There was insufficient evidence to support Petitioner's convictions

On direct appeal, Petitioner argued that trial court erred in refusing to grant his motion for judgment of acquittal because the State had failed to present any evidence that he intended the deaths of Angela Farmer or Danya Adams. The Delaware Supreme Court rejected this argument, holding that "there [was]

sufficient evidence for a rational finder of fact, viewing the evidence in the light most favorable to the State, to find [Petitioner] guilty beyond a reasonable doubt." Flonnory, 893 A.2d at 537.

In Claim Seven, Petitioner asserts that there was insufficient evidence adduced at trial to support his convictions for the intentional murder of Angela Farmer and Danya Adams, because no rational finder of fact could conclude beyond a reasonable doubt that Petitioner intended death as a result of either Tywman's and/or his actions. Petitioner does not appear to suggest that the Delaware Supreme Court applied an incorrect Constitutional standard, only that it unreasonably applied the applicable standard. Consequently, the Court will limit its inquiry to the latter issue.

The United States Supreme Court precedent governing Petitioner's insufficient evidence claim is Jackson v. Virginia, 443 U.S. 307 (1979). Pursuant to Jackson, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16. Additionally, "a federal habeas court faced with a record of

historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. However, it is not necessary that the evidence exclude every reasonable hypothesis except that of guilt. Id.

The jury in Petitioner's retrial was presented with the following evidence. On July 1, 1997, Adams shot Korey Twyman and also shot at Petitioner, resulting in one bullet passing through Petitioner's clothing and another bullet hitting Petitioner's mother's car when his nieces and nephews were inside. On July 14, 1997, when Twyman retaliated against Adams and his associates, Petitioner joined him, stating "let's go do them, handle our business." (D.I. 27, State's Ans. Br. in Flonnory v. State, No. 358,2004, at p. 39.) When Petitioner drove to Wilmington's west side in Robinson's car, he was in possession of a gun and a black hooded sweatshirt. At the shooting scene, Adams, Farmer, and Warren all suffered multiple gunshot wounds. As evidenced by the shell casings and slugs recovered from the victims' bodies, two different weapons were used in the July 14 shooting. The location of the shell casings in the mouth of the alleyway and the location of the victims as they fell from the shooting suggested an ambush of the intended targets. When Petitioner reentered Robinson's car, he was wearing the hooded

sweatshirt that he had balled up when he first got out of the car. Petitioner tried to put the sweatshirt over the stock of the gun. Additionally, Petitioner and Twyman bragged to their friends about having "shot up" the block and expending all of their ammunition. Id. at p. 40.

In order for Petitioner to be convicted of first degree murder, the State had to establish that Petitioner intentionally caused the death of another person. See Del. Code Ann. tit. 11, 636(a)(1). "A person acts intentionally with respect to an intentional first degree murder charge under the provisions of 11 Del. C., 636(a)(1) when 'it is the person's conscious object to engage in conduct of that nature or to cause that result.'" Burrell v. State, 766 A.2d 19, 25 (Del. 2000). After viewing the aforementioned evidence in the light most favorable to the prosecution, the Court concludes that the Delaware Supreme Court reasonably held that the record provided ample evidence from which a rational jury could have concluded that Petitioner intended the deaths of multiple individuals on July 14, 1997. For instance, the jury could have reasonably interpreted Petitioner's statement on July 14, 1997, "let's go do them, handle our business," as "shooting them." In addition, the jury knew about Petitioner's eagerness to join Twyman in avenging the earlier July 1 assault, and also that Petitioner possessed a gun both before and after the attack on July 14. When viewed in

context, the Court concludes that this evidence provided the jury
with a reasonable basis for convicting Petitioner on both charges
of first degree murder. Accordingly, the Court will deny Claim
Seven.

### 6. Claim Eight: The prosecutors committed constitutional error during the closing argument

Petitioner asserts that the prosecutors committed three
errors during their closing argument by: (1) inappropriately
expressing their personal beliefs with respect to the credibility
of certain evidence; (2) inappropriately expressing their
personal beliefs with respect to Petitioner's character; and (3)
improperly commenting on Petitioner's invocation of his post-
arrest right to remain silent.

In order for a prosecutorial misconduct claim to warrant
federal habeas relief, the prosecutor's comments must have "so
infected the trial with unfairness as to make the resulting
conviction a denial of due process." Darden v. Wainwright, 477
U.S. 168, 180 (1986)(citing Donnelly v. DeChristoforo, 416 U.S.
637 (1974)). A prosecutorial misconduct claim must be examined
in "light of the record as a whole" in order to determine whether
the conduct "had a substantial and injurious effect or influence"
on the jury's verdict. Brecht v. Abramson, 507 U.S. 619, 638
(1993). For the reasons set forth below, the Court concludes
that the prosecutors' statements during closing did not deprive
Petitioner of a fair trial.

25

a. Personal beliefs regarding evidence credibility

Petitioner contends that the following statement asserted by the prosecutor during closing argument suggested to the jury that some witnesses might be afraid of Petitioner, despite the fact that no witness testified as such:

> Some witnesses had difficulty recalling every detail of their earlier interviews. Some witnesses didn't want to recall them at all when faced eyeball to eyeball with [Petitioner]. Remember what Parsons said? It is not cool to be a snitch. It is not likely that they are the witnesses who want to remain silent when they face-to-face with [Petitioner]?

(D.I. 22, at p.19-20). Petitioner also contends that the prosecutor's next statement, asserted to clarify her intent after an objection was lodged by the defense, improperly vouched for the credibility of the State's witnesses at trial:

> It is true, ladies and gentlemen, that memories can fade and people recall different things differently at different points in their lives. Human nature being what it is, people will give statements behind closed doors or with a police officer when they are trying to benefit themselves. But in the clear light of day when it is going to be known publicly they provided information, they don't want to accept responsibility for their prior statements. Certainly, many of these people were friends and family of the defendant. Is it any wonder they wouldn't want it to be known they, in fact, had provided such information or be looked at as a snitch? Because as Renee Parsons says, it is not cool to be a snitch.

(D.I. 12, at p. 20). Petitioner presented these same arguments to the Delaware Supreme Court on direct appeal. The Delaware Supreme Court rejected the arguments, explaining that, when read

26

in context, the statements constituted "possible explanations for why several witnesses in the case took the stand and failed to remember their earlier statements . . . [and] the prosecutor was not arguing that the witnesses were afraid of Petitioner." Flonnory, 893 A.2d at 539.

Having independently reviewed these two prosecutorial statements in context with the record, the Court concludes that the Delaware Supreme Court's decision was not contrary to, or an unreasonable application of, the analysis articulated in Darden and Donnelly. During the prosecutor's sidebar with the trial court following the first statement, the prosecutor explained that a witness who was Petitioner's friend or family member would not want to be known as a "snitch" and might therefore testify differently from a prior statement given to the police. (D.I. 27, Appendix to Appellant's Op. Br. in Flonnory v. State, No. 358, 2004, at A-408 to A-410.) After hearing this explanation, the trial judge instructed the prosecutor to continue with her closing, noting that "there could be no inference whatsoever that there is a fear of the defendant because there is no evidence [of such] in the record." Id. at A-409. The trial judge also declined to give a curative instruction at this time, explaining that such an instruction would be more prejudicial because it would raise the whole issue of violence. Id. at A-410. The prosecutor continued with her rebuttal, explaining why a witness

27

who knew Petitioner might provide a trial testimony different
from a statement the witness gave to the police at an earlier
time, namely, that the witness may not want to be labeled a
"snitch". Reading the prosecutor's two remarks together and in
conjunction with the entire record, the Court is persuaded that
the Delaware Supreme Court reasonably applied Darden and Donnelly
in concluding that the prosecutor's first remark did not have a
"substantial and injurious effect or influence" on the jury's
verdict.

In turn, the Court concludes the prosecutor's second comment
did not constitute improper vouching as to the credibility of the
State's witnesses. Improper prosecutorial vouching occurs when
"the prosecutor [] assure[s] the jury that the testimony of a
Government's witness is credible[,] [] and this assurance is
based on either the prosecutor's personal knowledge or other
information not contained in the record." United States v. Lee,
- F.3d -, 2010 WL 2757340, at *16 (internal citation omitted).
After reading the prosecutor's second statement in context with
the record, the Court is persuaded that the statement did not
serve to assure the jury of the witnesses' credibility because it
did not reference the prosecutor's personal knowledge or evidence
outside the record; rather, the statement merely suggested a
possible explanation as to why the State's witnesses failed to
remember their earlier statements when they took the stand.

Accordingly, the Court concludes that the instant argument does not warrant relief.

          b.      Personal beliefs regarding Petitioner's character

Petitioner asserts that the prosecutor committed constitutional error by remarking that "[o]ut of all the reams of paper that are involved in this case, probably thousands, maybe even hundreds of thousands of paper in this case, they take out one line" regarding the possibility of return gunfire. Flonnory, 893 A.2d at 539. However, following a defense objection, the prosecutor re-phrased her remark, stating that "out of all the paper that is involved in this case, no matter how much it is, it certainly is a lot, the defense takes one line out of one report that says something about Dwayne Warren and white vans and throws it up against the wall to see whether it will stick or not." Id. Viewing both comments together, the Delaware Supreme Court dismissed the instant argument after concluding that the remarks amounted to mere hyperbole, not prosecutorial misconduct. Flonnory, 893 A.2d at 540. After reviewing Petitioner's argument in context with the record and the applicable law, the Court concludes that the Delaware Supreme Court's decision was neither contrary to, nor an unreasonably application of, Darden and Donnelly. Accordingly, Petitioner is not entitled to relief for this argument in Claim Seven.

c. Comments about Petitioner's right to remain silent

It is well-settled that a defendant's post-arrest silence cannot be used for impeachment purposes. See Miranda v. Arizona, 384 U.S. 436 (1966). Consequently, a prosecutor violates a defendant's due process rights by commenting on the defendant's failure to testify and may not improperly suggest that the defendant has the burden to produce evidence. See United States v. Baiter, 91 F.3d 427, 441 (3d Cir. 1996). However, it is also well-settled that the "fact of [a defendant's] post-arrest silence [can] be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." Doyle v. Ohio, 426 U.S. 610, 619 n.11 (1976). "[T]here is nothing improper about a prosecutor attempting to focus the jury's attention on holes in the defense's theory." United States v. Lore, 430 F.3d 190, 213 (3d Cir. 2005).

According to Petitioner, the prosecutor improperly observed that one and one-half years had passed between Petitioner's post-arrest statement to police, in which he did not mention the existence any "return gunfire," and Petitioner's testimony during the first trial whereby he indicated that there was some sort of return gunfire. The Delaware Supreme Court rejected this argument after viewing the prosecutors' statements in context with the trial as a whole, finding that the prosecutors' "fifteen

30

months" comments were not made with respect to Petitioner's post-arrest silence; rather, the statements were attempts to demonstrate the possible inconsistencies between Petitioner's initial police statement and the testimony he provided during his first trial.

After reviewing the challenged statement in context with the record in this case, the Court concludes that the Delaware Supreme Court's rejection of the instant argument was neither contrary to, nor an unreasonable application of, Donnelly or Darden. Not only had Petitioner changed his story over time, but also, during his first trial, Petitioner had testified as to why he omitted telling the police about the return gunfire when he provided his initial post-arrest statement. The prosecutor's references to the fifteen month passage of time between Petitioner's initial statement and his trial testimony were not designed to focus on, or draw meaning from, Petitioner's post-arrest silence, but rather, they were designed to demonstrate inconsistencies in Petitioner's stories for impeachment purposes. Because this type of impeachment is permissible under Doyle, the Court concludes that the Delaware Supreme Court's denial of the instant argument does not warrant relief.

### 7. Claim Eight: Ineffective Assistance of Counsel

Finally, Petitioner contends that defense counsel provided ineffective assistance during his trial and appeal by failing to:

31

(1) argue that the State relied upon perjured testimony and altered ballistics in pursuing his conviction; (2) "correctly argue" that the victims were killed by return gunfire; (3) "correctly argue" that the State failed to provide Petitioner with a correct transcript of Robinson's statement to police; (4) argue that the trial court erred by allowing the prosecution to knowingly introduce Dwayne Warren's testimony into evidence; and (5) investigate the theory that Dwayne Warren was responsible for the murders.

As an initial matter, the Court finds that it is procedurally barred from reviewing the merits of Petitioner's second and fifth assertions of error. Although Petitioner presented these two arguments in his Rule 61 motion, he did not present them to the Delaware Supreme Court when he appealed the Superior Court's denial of that motion. Delaware Superior Court Criminal Rules 61(i)(1), (2), and (4) would prevent Petitioner from raising the arguments in a new Rule 61 motion. Consequently, the Court must treat the arguments as exhausted but procedurally defaulted. Petitioner, however, asserts neither cause for, nor prejudice resulting from, his default of these arguments. Thus, the Court will deny the second and fourth ineffective assistance of counsel arguments as procedurally barred.

32

In contrast, Petitioner presented the remaining three arguments to the Delaware Supreme Court during his post-conviction appeal, and the State Supreme Court denied them as meritless. Therefore, the Court must determine if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established Federal law.

The clearly established Federal law governing ineffective assistance of counsel claims is the two-pronged standard enunciated in Strickland v. Washington, 466 U.S. 668 (1984). Under the first Strickland prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. Strickland, 466 U.S. at 688. Under the second Strickland prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's error the result would have been different." Id. at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. at 688. Although not insurmountable, the Strickland standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." Strickland, 466 U.S. at 689.

Here, the Delaware Supreme Court denied the instant ineffective assistance of counsel arguments after correctly

33

identifying the Strickland standard and analyzing the claims within its framework. Therefore, the Court concludes that the Delaware Supreme Court's denial of these three arguments was not contrary to clearly established Supreme Court precedent. See Williams, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The Court must also determine whether the Delaware Supreme Court unreasonably applied Strickland in rejecting the arguments. The Court will address each assertion of error in turn.

      a.    Failure to argue that the State's case was based on a "false theory"

Petitioner asserts that both his trial and appellate counsel provided ineffective assistance by failing to advance his theory that the "State's entire case was based on a false theory of crime and criminal liability." According to Petitioner, his attorneys should have argued that the State relied upon perjured testimony and altered ballistics evidence.

The record reveals that Petitioner's defense attorneys responded to this allegation in their Rule 61 affidavit, explaining that they did not advance this "conspiracy theory" because they "lacked a good faith basis to advance such an argument." Defense counsel explained how their careful consideration of the State's evidence led them to conclude that

they should instead develop and raise reasonable doubt, credibility, and factual arguments in support of Petitioner's defense. (D.I. 27.); Flonnory, 2008 WL 495780.

The Superior Court denied Petitioner's instant argument, because Petitioner failed to demonstrate how he was prejudiced by counsels' strategic decision. The Superior Court explained that Petitioner's argument was speculative, and that "the advancement of the conspiracy theory would have been fruitless and [] would have lessened [Petitioner's] chances for acquittal." Flonnory, 2008 WL 49580, at *2.

After reviewing the record, the Court concludes that the Delaware Supreme Court reasonably applied Strickland in affirming the Superior Court's denial of the instant allegation of error. Significantly, Petitioner has not identified, and the Court cannot discern, any deficiency in counsels' preparation for trial. Petitioner has not provided any support for his conspiracy theory, and the record demonstrates that Petitioner's defense attorneys only rejected Petitioner's "conspiracy theory" after they thoroughly investigated the law and relevant facts. In these circumstances, the Court concludes that Petitioner has failed to demonstrate a reasonable probability that the outcome of his proceeding would have been different but for counsels' alleged failure to advance a meritless conspiracy theory. Accordingly, the Court will deny this portion of Claim Eight.

35

### b. Failure to correctly argue that the State failed to provide him with a correct transcript of Robinson's statement

Petitioner contends that his attorneys did not "correctly argue" that the State failed to provide him with a correct transcript of Robinson's testimony. A fatal flaw in this argument, however, is the fact that Petitioner does not identify any alternate theory which counsel should have presented, or how counsel could have "correctly" argued the claim that they actually did assert on direct appeal. Without any clear explanation of counsels' alleged error, the Court concludes that Petitioner cannot demonstrate the requisite prejudice under Strickland. Accordingly, the Court will deny Petitioner's third allegation of attorney error.

### c. Failure to argue that the trial court erred by admitting Dwayne Warren's testimony into evidence

In his final argument, Petitioner contends that his attorneys were ineffective for failing to argue that the trial court erred by allowing the prosecution to knowingly introduce Dwayne Warren's testimony into evidence. However, as discussed earlier in the Opinion, defense counsel did raise this argument during Petitioner's direct appeal, and the Delaware Supreme Court denied the argument as meritless. Accordingly, the Court will deny Petitioner's final assertion of ineffective assistance as factually baseless.

## IV. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. See 3d Cir. L.A.R. 22.2 (2008). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 484 (2000). If a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. Id.

The Court has concluded that the claims in Petitioner's Application For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 are either procedurally barred, noncognizable, or do not warrant relief under § 2254(d)(1). The Court is persuaded that reasonable jurists would not find this conclusion to be debatable, and therefore, the Court declines to issue a certificate of appealability.

37

**V.   CONCLUSION**

     For the reasons discussed, Petitioner's Application For A Writ Of Habeas Corpus Pursuant To 28 U.S.C. § 2254 will be denied.   An appropriate Order will be entered.